# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | |
| | : | |
| | : | |
| v. | : | No. 641 C.D. 2018 |
| | : | Argued: April 9, 2019 |
| Jennifer Bucher, | : | |
| Appellant | : | |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ANNE E. COVEY, Judge (P.)
           HONORABLE MICHAEL H. WOJCIK, Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED:  August 15, 2019**

Jennifer Bucher (Defendant) appeals from a Memorandum and Order of the Court of Common Pleas of Dauphin County (trial court), issued after a trial de novo, finding her guilty of harboring a dangerous dog in violation of Section 502-A of the Dog Law.[1]  Defendant argues, *inter alia*, that there was insufficient evidence to support the conviction because the attack was provoked.  We agree and, accordingly, reverse.

---

[1] Act of December 7, 1982, P.L. 784, *as amended*, 3 P.S. § 459-502-A.  Section 502-A was added by Section 2 of the Act of May 31, 1990, P.L. 213.

## I. Factual and Procedural History

Defendant was cited under Section 502-A of the Dog Law for harboring a dangerous dog after two of her dogs, Maui and Dozer, both pit bull mixes, engaged in a fight on May 19, 2016, and injured Defendant upon her attempt to break it up. Section 502-A provides that the owner of a dog shall be guilty of the summary offense of harboring a dangerous dog if the dog inflicted severe injury or attacked a human without provocation and has a history or propensity to attack without provocation. 3 P.S. § 459-502-A. After being cited by police, Defendant was found guilty by the Magisterial District Judge and filed a summary appeal of the conviction with the trial court.

The trial court held a de novo trial, at which the Commonwealth called Defendant's neighbors and the police officer who responded to the 911 call on the night in question to testify. Defendant testified on her own behalf.

Defendant's neighbor, Vicki Mora (Mora), testified first as follows. Mora was sitting on her porch on the night of the incident when her daughter alerted her that Defendant was being attacked by her dogs. Mora then saw the dogs fighting on the ground with Defendant and called 911. (Hr'g Tr. at 6.) After Defendant separated the dogs and put them in the house, Mora saw Defendant outside and noticed her arm was "ripped open" and bleeding. (*Id.* at 10.) Mora offered Defendant a towel for her arm and called Defendant's husband and father at Defendant's request. Mora had previously contacted police about one of Defendant's dogs after she witnessed it jump the fence of Defendant's yard and growl at and fight with a passerby's dog. Defendant's dogs would often growl or bark and run to the edge of the fence when people walked by Defendant's house, and Mora is afraid of Defendant's dogs.

2

Defendant's other neighbor, Delores Nickel (Nickel), also testified as follows. On the night of the incident, Nickel was in her yard talking with Defendant over the fence that separated their properties. Two of Defendant's dogs were by the fence when they started fighting with each other. Nickel left the yard briefly to bring her own dog inside her house and, when she returned, Defendant was on the ground behind the fence trying to pull the dogs apart. (*Id.* at 28.) Nickel was unable to see what was happening behind the fence between Defendant and the dogs from Nickel's position on her porch. After some time had passed, Nickel saw Defendant bring the dogs into the house. Defendant came to Nickel's house that evening after the incident, and Nickel observed that Defendant was bleeding from her arm. Defendant sat down on Nickel's kitchen floor after explaining that she was feeling faint. (*Id.* at 29.) Defendant later told Nickel that she received approximately 27 stitches for the injury to her arm. Nickel had played with Defendant's dogs in the past and had never been injured or attacked by them.

Officer Patrick Corkle (Officer Corkle) testified as follows. Officer Corkle met Defendant at Nickel's residence on the night of the incident. Defendant was "reluctant to answer any of [Officer Corkle's] questions," and told Officer Corkle "'[y]ou're gonna take my dogs away. I know you're gonna take my dogs away.'" (*Id.* at 38.) Defendant explained the incident to Officer Corkle, recounting that the dogs had been fighting. Defendant told Officer Corkle that she tried to separate them and ended up on the ground with the dogs, at which point one of them bit her.

Defendant testified on her own behalf as follows. Defendant had seven dogs residing at her home at the time of the incident, three of which were pit bull mixes. On the night of May 19, 2016, Defendant returned home and brought all of her dogs outside to the yard. Defendant was playing fetch with two of the dogs before talking

3

with Nickel at the fence.[2]  While Defendant was talking with Nickel, the dogs were barking and chasing each other around, which was typical behavior for them. Defendant then heard the dogs snarling and noticed two of them were fighting. Defendant brought the other dogs in the house and then attempted to break up the dog fight by "yell[ing] at them," "pushing them," and finally "div[ing] on top of them." (*Id.* at 55.)  Sometime during Defendant's attempts to separate the dogs, one of them bit her.  After Defendant separated the dogs and cleaned them and herself up, she went outside, where she briefly spoke to Mora about contacting Defendant's husband and father. (*Id.* at 56-57.)  Defendant felt lightheaded and went to Nickel's house.  Defendant did not want to speak with Officer Corkle when he arrived at Nickel's house, as she was afraid of what the consequence might be for her dogs.[3]

Following Defendant's testimony, Defendant sought to admit on stipulation reports from two different dog trainers who had observed and tested the dogs in the weeks following the incident and made conclusions as to their temperaments.  The dog trainers were also present to testify.  The trial court ultimately declined to admit the reports or hear the testimony, and Defendant rested her case.

The trial court issued its Memorandum and Order, affirming the conviction and reinstating the sentence of the Magisterial District Judge.  The trial court first

---

[2] Defendant also testified that the fence around her yard was approximately 3½ feet high. Defendant explained that she tried to obtain a variance for a 6-foot-tall fence but was denied. (Hr'g Tr. at 67-68.)  The trial court emphasized this fact in the Memorandum, but we do not find it relevant for our analysis under Section 502-A.

[3] Defendant also testified briefly as to a meeting with the dog warden after her conviction before the Magisterial District Judge regarding her obligations with the dog following the conviction.  There are various requirements for a dog owner after a conviction under Section 502-A, including, among others, registering the dog with the Department of Agriculture, confining the dog in an area with proper postings, microchipping the dog, having the dog spayed or neutered, and obtaining surety bonds and liability insurances. *See* Section 503-A of the Dog Law, added by Section 2 of the Act of May 31, 1990, P.L. 213, *as amended*, 3 P.S. § 459-503-A.

emphasized that the pit bull breed is inherently bred to attack. It then turned to the elements of Section 502-A. Because it was undisputed that Defendant was the owner or keeper of the dog, the trial court's discussion focused only on whether the dog attacked or inflicted severe injury on a human being without provocation and whether Defendant's dogs had either a history or propensity to attack without provocation. Based on the statutory definition of "attack," which is "[t]he deliberate action of a dog, whether or not in response to a command by its owner, to bite, to seize with its teeth or to pursue any human, domestic animal, dog or cat," Section 102 of the Dog Law, 3 P.S. § 459-102, the trial court found that the evidence established the dog attacked Defendant. Based upon the Pennsylvania Supreme Court's interpretation of the term "provocation," the trial court further found that the attack was without provocation, disagreeing with Defendant that she provoked the dogs by jumping on them. Relying on the Supreme Court's decision in *Eritano v. Commonwealth*, 690 A.2d 705 (Pa. 1997), and the dictionary definitions for provocation discussed therein, the trial court concluded there was no evidence that Defendant "had the intent to incite the anger in the dogs or that she was attempting to purposely stir them up;" therefore, the attack was without provocation. (Memorandum and Order at 6.) In addition, the trial court found evidence of severe injury, as Defendant sustained wounds exposing the tissue under her flesh and required 27 stitches.

With regard to whether the Commonwealth established that Defendant's dogs had either a history or propensity to attack without provocation, the trial court concluded that there was sufficient evidence of this as well. Noting that the 1996 amendments to the Dog Law permit the finding of a propensity based on a single attack, the trial court determined that the single attack in the instant matter was so

5

severe that it demonstrated the dogs' propensity to attack without provocation. (*Id.* at 8 (citing *Commonwealth v. Hake*, 738 A.2d 46, 49-50 (Pa. Cmwlth. 1999)).) Accordingly, the trial court entered its Order dismissing Defendant's summary appeal and affirming and reinstating her sentence.

Defendant appealed.[4]  Before this Court,[5] Defendant raises three issues, arguing:   (1) there is insufficient evidence to support the conviction because Defendant provoked the attack; (2) the conviction is against the weight of the evidence because the trial court erred by applying a standard where provocation requires intent; and (3) the trial court abused its discretion by not allowing Defendant to present testimony from the dog trainers.  We address the first two issues together, as they are intertwined to the extent that they relate to the standard for provocation.

## II.    Parties' arguments regarding provocation

Defendant argues that the Commonwealth did not meet its burden by proving the dogs attacked her without provocation or that the dogs have a propensity to attack without provocation.  Citing to *Commonwealth v. Austin*, 846 A.2d 798 (Pa. Cmwlth. 2004), and *Hake*, Defendant argues that this Court has found that there is no provocation for an attack where there is no physical contact between the victim and the dog, which is not the case here.  Defendant contends that her acts of yelling at, pushing, and jumping on the dogs to break up their fight incited their anger and provoked one of them to injure her.  Because Defendant was aware the dogs were agitated and fighting, she should have discerned that jumping on them would

---

[4] Defendant initially appealed to the Superior Court, which transferred the case to this Court.

[5] Our review of the trial court's conviction following the trial de novo is limited to whether the trial court's findings are supported by substantial evidence, the trial court erred as a matter of law, or the trial court abused its discretion.  *Hake*, 738 A.2d at 47 n.4.

6

provoke one of the dogs to bite her. Further, Defendant contends that the trial court erred when it required that the victim have an **intent** to provoke the dogs, as the only relevant inquiry is whether Defendant's acts did, in fact, provoke the dogs. (Defendant's Brief (Br.) at 21 (citing *Aegis Sec. Ins. Co. v. Pa. Ins. Dep't*, 798 A.2d 330 (Pa. Cmwlth. 2002)).)

Acknowledging that a propensity to attack without provocation may be established by only one incident, Defendant nonetheless asserts that because **she provoked** one of the dogs to bite, this incident alone cannot suffice to prove a propensity to attack **without** provocation. Further, Defendant argues that the Commonwealth could not prove a history of propensity to attack because Mora's testimony about one of Defendant's dogs attacking an unknown pedestrian's dog was too vague to prove the incident occurred. Defendant also contends that the trial court applied a higher burden in the present case because the trial court has "a clear bias" against pit bulls. (Defendant's Br. at 20.)

The Commonwealth responds that it presented sufficient evidence to sustain Defendant's conviction. The Commonwealth notes that all parties agree that Defendant owns the dogs and that Defendant was attacked by the dogs. As for whether the attack was unprovoked, the Commonwealth argues that Defendant did not incite or stir up anger in the dogs, but rather tried only to break up the fight; thus, the dogs' subsequent attack was unprovoked. If this Court was to determine that the attack was provoked, the Commonwealth asserts that it would be contrary to the purpose of the Dog Law, as it would mean that a dog could not be found dangerous if it was fighting another dog when it attacked a human. Moreover, the Commonwealth asserts that there is "overwhelming evidence" to support a finding that the dogs have both a propensity to attack and a history of attacking based on the

severity of Defendant's injuries and Mora's testimony about the dogs' history. With regard to Defendant's assertion that the verdict is against the weight of the evidence or that the trial court erred in not permitting the dog trainers to testify, the Commonwealth contends that Defendant has waived these issues by not raising them before the trial court. The Commonwealth asks us to affirm.

## III.  Discussion

Section 502-A of the Dog Law requires the Commonwealth to prove, beyond a reasonable doubt, the following three elements:

> (1) The dog has done any of the following:
>
>> (i) Inflicted severe injury on a human being without provocation on public or private property.
>> . . . .
>>
>> (iii) Attacked a human without provocation.
>> . . . .
>
> (2) The dog has either or both of the following:
>
>> (i) A history of attacking human beings and/or domestic animals, dogs or cats without provocation.
>>
>> (ii) A propensity to attack human beings and/or domestic animals, dogs or cats without provocation. A propensity to attack may be proven by a single incident of the conduct described in paragraph (1)(i), (ii), (iii), or (iv).
>
> (3) The defendant is owner or keeper of the dog.

3 P.S. § 459-502-A. The parties agree that Defendant is the owner of the dog and Defendant was attacked by the dog. The parties also do not appear to dispute that Defendant suffered severe injury in the attack. Thus, like the trial court, we focus

on whether the attack or severe injury occurred without provocation and whether the dogs have a history or propensity to attack humans or domestic animals, also without provocation, as required by Section 502-A. *Id.*

### a. Defining provocation

The Dog Law does not define "provocation," and both parties and the trial court acknowledged that there is little case law addressing the meaning of provocation under Section 502-A. We begin with the Supreme Court's decision in *Eritano*, upon which the trial court relied. There, a 5-year-old child was at a friend's house eating a piece of chicken, when the friend's dog lunged for the chicken and bit the child's face and neck, causing various injuries. In order to determine whether there was sufficient evidence for a conviction under Section 502-A, the Supreme Court had to interpret the language of that section. Noting that the object of statutory instruction is "to ascertain and effectuate the intention of the legislature," the Court also reiterated that where words in a statute "are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Eritano*, 690 A.2d at 708 (citing Section 1921 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1921).

Because the term "provocation" was undefined in the Dog Law, the Supreme Court relied on the dictionary definition of "provocation," which included "to incite to anger," and "to stir up purposely." *Id.* at 709. Applying that definition, the Supreme Court concluded that "[a] child attempting to eat a piece of chicken clearly does not" "incite to anger" a dog such that it could be provocation within the meaning of Section 502-A. *Id.* Ultimately, the Supreme Court concluded that there

9

was no evidence of the dog's history to attack without provocation based on only one incident.[6] *Id.*

We determined that there was sufficient evidence for a conviction under Section 502-A in *Baldwin*, 767 A.2d at 646-47, and *Commonwealth v. Seyler*, 929 A.2d 262, 266 (Pa. Cmwlth. 2007). In *Baldwin*, the victim was walking home from a party when she observed a dog in the middle of the street. After stopping for a brief conversation with a neighbor, the victim continued to walk down the street when the dog approached her, growling and snarling. The victim attempted to back away from the dog, but the dog moved faster towards her and lunged, biting the victim and knocking her to the ground. In *Seyler*, the dog in question was in a dog fight when a neighbor called out to ask the dog's owner if she needed help. One of the dogs then ran onto the neighbor's property, attacking and biting the neighbor. Given these facts, this Court affirmed the courts of common pleas' upholding of the convictions under Section 502-A. *Baldwin*, 767 A.2d at 646-47; *Seyler*, 929 A.2d at 266.

The Dog Law is not the only statute in which the question of a dog's provocation is relevant. For example, in *Aegis Security*, we reviewed whether a dog attack on a state trooper was provoked such that it constituted a "substantial change or increase in hazard" to justify the cancellation of a homeowner's insurance policy

---

[6] Shortly following *Eritano*, the General Assembly passed the 1996 amendments to the Dog Law, which clarified that a propensity to attack without provocation can be established by one incident. *See Commonwealth v. Baldwin*, 767 A.2d 644, 645 (Pa. Cmwlth. 2001); *Hake*, 738 A.2d at 49. This Court has interpreted the 1996 amendments as imposing strict liability for the offense of harboring a dangerous dog; otherwise "the difficulty of establishing culpability for injuries would surely frustrate the purpose of the [Dog Law]." *Hake*, 738 A.2d at 49.

under Section 5(a)(9) of the Unfair Insurance Practices Act.[7] *Aegis Sec.*, 798 A.2d at 332. Acknowledging that the "same thread of provocation" existed in both Section 502-A cases and insurance cases for increases in hazard, we explained the circumstances in which provocation is found. *Id.* at 333. For example, the Insurance Commissioner had found an increase in hazard where a dog left its owners' property and attacked a victim. However, the Insurance Commissioner also found no increase in hazard where, for example, a dog without a history of aggression bit a child when the child approached after the dog was fed. Applying this standard of provocation to the state trooper's actions in *Aegis Security*, this Court determined that the state trooper who was bitten **did** provoke the attack. *Id.* at 334. The trooper had routinely approached the house from the driveway in the past, and he and the dog had interacted without incident. On the day of the attack, however, the trooper approached the house from a different part of the property, near a "no trespassing sign," and when the dog began to move towards him, the trooper waved a leather portfolio at the dog. We explained that the trooper appeared "to be someone who did not belong, and made what [the dog] interpreted as a threatening gesture." *Id.* Therefore, this attack was provoked.

Other states have similar laws regarding dangerous dogs, which also examine whether there was provocation. These courts have determined that a dog attack can be provoked by the victim depending upon the circumstances. For instance, in *Pfaum v. Summit County Animal Control*, 92 N.E.3d 132, 133 (Ohio Ct. App. 2017), the victim was in her garage when she heard two neighborhood dogs fighting. The

---

[7] Act of July 22, 1974, P.L. 589, *as amended*, 40 P.S. § 1171.5(a)(9). Section 5(a)(9) provides that an unfair or deceptive act in the insurance business includes "[c]ancelling any policy of insurance" unless "there has been a substantial change or increase in hazard in the risk assumed by the company subsequent to the date the policy was issued." *Id.*

victim attempted to separate the dogs by striking the dogs and pulling at their collars when one of the dogs bit the victim, leaving her with serious injuries. *Id.* at 134-35. Looking to Ohio's statute concerning dangerous dogs and the corresponding regulations, which specified that "without provocation" meant that the dog "was not teased, tormented, or abused by a person . . . . ," the Ohio Court of Appeals determined that the victim had provoked the attack. *Id.* at 135-36. The court emphasized that it was **not** the victim's noble **intention** that was the crux of the inquiry, but rather whether the victim's actions could be considered tormenting the dog in a way that provoked the attack. *Id.* at 136. Because there was "no evidence to suggest that [the dog] would have bitten [the victim] if she had not struck the dog and pulled its collar," the court could not conclude that the dog attacked without provocation. *Id.*

The Supreme Court of New York, Appellate Division, reached a similar conclusion in *People v. Shanks*, 105 A.D.3d 1103, 1104 (N.Y. App. Div. 2013), where it interpreted the terms of that state's dangerous dog law, which defined a dangerous dog as one that attacks "without justification." There, a dog was leashed to a porch when it escaped and attacked another dog that was being walked by its owner down the sidewalk. The dog that escaped and initiated the fight suffered injury, and its owner filed a complaint seeking to have the **other** dog declared dangerous under New York's equivalent to the Dog Law. Like Pennsylvania's Dog Law, New York's statute provided that a dog could be declared dangerous if it attacked and injured another dog. However, the New York statute provided that if the dog was justified because it was responding to pain or injury or was protecting its owner, the dog would not be considered dangerous. The court found that there was insufficient evidence for the judgment that the dog was a dangerous dog,

reasoning that because it was "[a]ttacked by another dog with his owner at close range," its "protective and defensive instincts were entirely understandable, even expected." *Id.* at 1105.[8]

From these cases, it appears that there is no provocation when a person does not go near a dog and, for example, is eating chicken, *Eritano*, 690 A.2d at 709, walking in the street away from the dog, *Baldwin*, 767 A.2d at 646-47, calling out from a neighboring property, *Seyler*, 929 A.2d at 266, or when the dog escapes from a house and runs into the street and attacks, *Shanks*, 105 A.D.3d at 1105. However, there has been provocation when a person goes near the dog and makes what the dog could interpret as a threatening gesture, *Aegis Security*, 798 A.2d at 334, or engages in physical contact with a dog, by attempting to separate fighting dogs, and pulling at a dog's collar, *Pfaum*, 92 N.E.3d at 136.

   b. *Whether the Commonwealth met its burden to show that the attack was unprovoked*

Here, the trial court concluded that the attack was without provocation because there was no evidence that Defendant "had **the intent** to incite the anger in the dogs or that she was attempting to **purposely** stir them up." (Memorandum and Order at 6 (emphasis added).) However, neither the case law in this Commonwealth nor elsewhere, has focused on the intent of the victim to determine whether there was provocation. For example, in *Aegis Security* the Court did not mention whether

---

[8] The court in *Shanks* also noted its disagreement with the trial court's reasoning that the dog, a pit bull, was particularly dangerous given its breed. Because there was "no persuasive authority for the proposition that a court should take judicial notice of the ferocity of any particular type or breed of domestic animal," and no evidence was presented to show a prior history of attacks by the pit bull, the Court concluded that the trial court had no basis for its assumption otherwise. *Shanks*, 105 A.D.3d at 1105. Here, to the extent that the trial court reasoned in part that pit bull terriers are an unusually dangerous breed, there is no source of law currently in the Commonwealth that supports such an assumption and no evidence was presented to that effect.

the victim intended to incite the dog; based on the facts, there was no indication that the victim intended more than just to "shoo her away from him." 798 A.2d at 331. This was true as well in *Seyler* and *Baldwin*, where we concluded the attacks were unprovoked, without considering the intent of the victims. Rather, we analyzed only the victims' actions and the dogs' responses thereto. An interpretation of provocation without regard to victim intent is a common sense reading of the statute, as there are likely few scenarios in which a victim would intend to incite or provoke a dog to such anger that the dog would attack in response. Accordingly, to the extent that the trial court's conclusion was dependent on the fact that Defendant did not intend to incite the dog, this was in error.

Defendant's actions here are similar to the victim in *Pfaum* who was injured trying to separate fighting dogs by striking them and pulling at their collars. 92 N.E.3d at 136. In *Pfaum*, the court recognized that the victim was well-intentioned; however, there was no evidence that the dog would have bitten the victim "if she had not struck the dog and pulled on its collar." *Id.* Here as well, there is no evidence to suggest that the dog would have attacked Defendant had she not jumped on the dogs in an attempt to break up their fight. It is not Defendant's good intentions that guide the analysis, but whether her actions incited the dogs in such a manner that the provocation was the cause of the attack. *Id.* This is illustrated by our Court's reasoning in *Aegis Security*: "the record reflects that [the dog] was provoked when the [victim] passed a 'No Trespassing' sign, appeared to [the dog] to be someone who did not belong, and made what [the dog] interpreted as a threatening gesture." 798 A.2d at 334. If a victim's actions of approaching a property in an unfamiliar manner and waving a leather portfolio at a dog is sufficient to provoke an attack, *id.*,

14

then Defendant's act of pushing apart and jumping on the dogs to separate them is likewise sufficient to constitute provocation of one of the dogs.

Defendant is not like the victims in *Eritano*, *Seyler*, or *Baldwin*. In *Eritano*, the victim was merely eating a piece of chicken when the dog attacked. In *Seyler*, the victim was on her own property asking a neighbor if she needed help when the dog came into her yard and attacked. Similarly, the victim in *Baldwin* was walking down the street towards her home when the dog left its owner's property and attacked. Unlike those victims, Defendant in this case was not merely a passerby or going about her routine when the dog unexpectedly approached and attacked. Defendant purposely inserted herself into a dog fight, a situation in which the dogs were clearly already agitated. Moreover, she further escalated the situation in her well-intentioned attempts to break up the fight by pushing apart the dogs and jumping on them. Given all of this, the dogs' "protective and defensive instincts were entirely understandable, even expected." *Shanks*, 105 A.D.3d at 1105. Therefore, the attack was provoked.

Accordingly, the Commonwealth did not meet its burden of showing Defendant was attacked or severely injured **without provocation**, the first element under Section 502-A of the Dog Law.[9] For similar reasons, the Commonwealth necessarily could not satisfy the second element of its prima facie case, showing that the dog had a history of or propensity to attack humans **without provocation.** 3 P.S. § 459-502-A(a)(2). Because there is insufficient evidence to support a conclusion

---

[9] We note that this opinion does not stand for the proposition that a dog can never be found dangerous when it injures a person while it is fighting another dog, as the Commonwealth suggests. Our determination that this attack was provoked is not based on the fact that the dogs were fighting with each other. Instead, we find that Defendant's actions in attempting to break up the dog fight are what provoked the attack in this case.

that the first two elements under Section 502-A are met, the trial court erred in affirming the conviction.

## IV.    Conclusion

Defendant provoked the attack by her actions trying to break up the dog fight. Therefore, there is not sufficient evidence to support the trial court's Memorandum and Order affirming the conviction, as the first two elements under Section 502-A are not met.  Therefore, we reverse.[10]

_____
**RENÉE COHN JUBELIRER,** Judge

---

[10] Given our disposition, we do not address Defendant's remaining arguments on appeal.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Commonwealth of Pennsylvania      :
         :
         :
        v.          :    No. 641 C.D. 2018
         :
Jennifer Bucher,          :
         Appellant     :

# **O R D E R**

     **NOW**, August 15, 2019, the Order of the Court of Common Pleas of Dauphin County, dated July 20, 2017, is hereby **REVERSED**.

 

 

_____

**RENÉE COHN JUBELIRER,** Judge
